**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. _____**

ELISA GARCIA, individually and
on behalf of all others similarly situated,

      Plaintiff,

      vs.                           Jury Trial Demanded

CLARINS USA, INC., CLARINS INC.,
CLARINS NORTH AMERICA, INC.,
CLARINS GROUP NORTH AMERICA, INC.,
CLARINS SA, CLARINS PARIS

      Defendants.
_____/

**CLASS ACTION COMPLAINT**

      Plaintiff Elisa Garcia, individually and on behalf of all others similarly situated, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

**NATURE OF THE ACTION**

      1.      The search for youth and beauty in a bottle is nothing new. For centuries, humans have attempted to find ways to correct their appearances. Indeed, throughout history there has been no shortage of products (including the infamous "snake oil" tonic from a by-gone era) that purport to "cure" or "treat" the "disease of old age."

2.      Clarins SA and Clarins USA, Inc., Clarins Inc., Clarins North America Inc., Clarins Paris and Clarins Group North America Inc. (collectively "Clarins" or "Defendants")[1] prey on consumers' fundamental fears of aging, loss of beauty and vitality.

3.      In fact, Clarins profits handsomely by its false, deceptive or misleading claims that its beauty enhancing creams, including those from the Vital Light Collection and the Body Lift Collection (collectively the "Beauty-Enhancing Creams") have specific effects on the human skin and body.  For example, among other things, Clarins specifically promises that:

- Vital Light Night Revitalizing Anti-Ageing[2] [sic] Cream: "Only Clarins science harnesses the power of two rare pioneer plants that work while you sleep — bathing skin in age-defying luminosity. Cochlearia Officinalis and Waltheria extracts* reorganize weak collagen into a resilient cushion that beams light up to the skin's surface, restoring the deep luminosity of young-looking skin. Palmitoyl Glycine encourages optimal skin nutrition for a fresh, 'lit from within' glow by morning.
        * International patents pending."

- Body Lift Cellulite Control, "breaks the vicious cycle with the first slimming treatment that prevents and corrects the appearance of cellulite at every level. Targets cellulite before it starts – visibly smoothing hips, buttocks and thighs…four patents pending."

- Body Lift Cellulite Control, "A body cream for the hips, thighs, and buttocks that visibly corrects stubborn cellulite while smoothing, firming, and redefining."

- High Definition Body Lift, "Fights Cellulite – Get your body into sleek, show-off shape! Clarins patented cellulite-fighter — with Blue Button Flower, Geranium and Cangzhu root — helps release and flush-out trapped fatty deposits on hips and thighs. Defines, contours and refines for a visible lifting and smoothing effect."

---

[1]      As the precise corporate structure of Defendants is unclear at the time of filing, Plaintiff reserves the right to add additional Defendants should it become necessary as discovery progresses.  The use herein of one of the Defendants shall not be deemed to exclude any other. The Defendants have made it impossible for a consumer to determine which entity in fact produces, distributes and sells the various Beauty-Enhancing Creams.

[2]      In each instance where the word "Aging" has been misspelled "Ageing," Plaintiff has quoted the misspelled word as it has been written by Defendants, even though Plaintiff has not identified Defendants' errors in each such instance with "[sic]."

4.      Unfortunately, unbeknownst to consumers, these efficacy claims (and the others detailed below) are false, deceptive and misleading.

5.      As explained more fully herein, Clarins has made, and continues to make, deceptive and misleading claims and promises to consumers about the efficacy of its Beauty-Enhancing Creams in a pervasive, nation-wide marketing scheme that confuses and misleads consumers about the true nature of the products.  In reality, the Beauty-Enhancing Creams do not – and cannot – live up to the claims made by Clarins.

6.      Clarins knows this, yet designs its marketing and advertising campaign to include indicia of scientific research and promises of specific results for the sole purpose of misleading and deceiving consumers.  As a result, Clarins' marketing pitch is the same as that of the quintessential snake-oil salesman – Clarins dupes consumers with false and misleading promises of results it knows it cannot deliver, and does so with one goal in mind – reaping enormous profits.

7.      Indeed, the only reason a consumer would purchase the high-priced Beauty-Enhancing Creams sold by Clarins instead of much lower-priced moisturizers, which are readily available, is to obtain the unique results that Clarins promises.

8.      A direct effect of this pervasive and deceptive marketing campaign is that consumers across the country, including Plaintiff and the proposed Class and Subclass, were exposed to Clarins' false and misleading misrepresentations and purchased Beauty-Enhancing Creams for exorbitant prices with ingredients that do not, and cannot, provide the results promised.

9.      Clarins' false and misleading statements about the efficacy of a particular product are equally applicable to each of the products within that specific collection.  For example, for

each of the Vital Light products (serum, day cream, and night cream) ("Vital Light Products"), Clarins specifically promises that its unique formula will provide spectacular age-defying results including reducing wrinkles and firming the skin.

10.     Accordingly, because each of the Vital Light Products contains essentially the same efficacy promise, and because Clarins repeats the same promises for each, and sells the products together through its "works well with" and "you might also like" claims, the misleading claims touting the supposed benefits are equally applicable to all of the Vital Light Products. The same holds true for the Body Lift and Shaping Collections as described in more detail below.

11.     Clarins' marketing campaign for each of the Beauty-Enhancing Creams follows the same deceptive pattern and practice – Clarins makes specific efficacy promises based on purported scientific research and new discoveries of specific ingredients that deceive and mislead consumers into believing that the Beauty-Enhancing Creams they are purchasing will provide the promised and unique results.  Such promises are deceptive and misleading.

12.     Clarins' Beauty-Enhancing Creams, and those of its competitors, are sold in a different manner than less expensive wrinkle creams or moisturizers, which affects the manner in which Plaintiffs and the Class are exposed to the false and deceptive claims.  While lower-priced consumer products are available on the shelves of drug stores and supermarkets, the Beauty-Enhancing Creams are sold mainly though counters at high-end department stores.  Sales persons who are specifically trained by Clarins to sell its Beauty-Enhancing Creams routinely occupy the counters, where Clarins also provides consumers access to product displays and sales brochures. Accordingly, instead of making a side-by-side comparison of product packaging on store shelves, consumers of the Beauty-Enhancing Creams decide to purchase these products almost

exclusively by virtue of marketing campaigns that reach consumers before they enter the retail outlets (*i.e.*, print media advertisements, television commercials or internet marketing) or through the counter sales and point of sale advertising.

13.     Regardless of where Plaintiff and the other members of the Class and Subclass purchased the Beauty-Enhancing Creams (*i.e.*, on-line directly from Clarins, in a department store at the Clarins counter, or from other third-party retailers like Sephora or Amazon), they were exposed to Clarins' pervasive deceptive and misleading advertising messages and material omissions regarding the efficacy promises of the Beauty-Enhancing Creams.   Indeed, no reasonable consumer would accidentally purchase a jar of wrinkle cream or cellulite cream for the high prices charged by Clarins without some "knowledge" of what the product claims to do.

14.     Plaintiff seeks relief in this action individually and as a class action on behalf of all purchasers in the United States of at least one of the Beauty-Enhancing Creams ("the Class") at any time from the date of product launch for each of the Beauty-Enhancing Creams to the present (the "Class Period") for unjust enrichment, breach of express warranty, and for violation of Florida Statutes § 501.201, *et seq.*, the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").   Pending completion of discovery, Plaintiff may seek leave to amend the Class definitions.

15.     Plaintiff Garcia also seeks relief individually and on behalf of a subclass of residents of her home state of Florida (the "Florida Subclass").

## THE PARTIES

16.     Plaintiff Garcia is a citizen of the State of Florida, residing in Dade County. Plaintiff purchased Vital Light Night Revitalizing Cream and Body Lift Cellulite Control from the Macy's department store at the Dadeland Mall in Miami, Florida in or about January 2013

for personal use.  As set forth in greater detail below, in or about January 2013, Plaintiff Garcia saw, read, and received Clarins' material misrepresentations and omissions as described more fully herein, including Clarins' many false and misleading product claims, and relied on those material misstatements and omissions in making her decision to purchase Vital Light Night Revitalizing Cream and Body Lift Cellulite Control.  Plaintiff Garcia would not have purchased Vital Light Night Revitalizing Cream and Body Lift Cellulite Control had Clarins not made such false and deceptive claims and instead disclosed the true nature of its products.

17.     Upon information and belief, Defendant Clarins USA, Inc. is a New York corporation with its principal place of business in New York.

18.     Upon information and belief, Defendant Clarins, Inc., is Delaware corporation with its principal place of business in Delaware.

19.     Upon information and belief, Defendant Clarins North America Inc. is a Delaware corporation with its principal place of business in Delaware.

20.     Upon information and belief, Defendant Clarins Group North America Inc. is a Delaware corporation with its principal place of business in Delaware.

21.     Upon information and belief, Defendant Clarins SA is a French company, with its principal place of business in Paris, France.

22.     Upon information and belief, Defendant Clarins Paris is a French company, with its principal place of business in Paris, France.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds

$5 million exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

24.     Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because Defendants conduct business in this District and a substantial part of the events, omissions and acts giving rise to the claims herein occurred in this District.  Defendants distributed, advertised and sold the Beauty-Enhancing Creams, which are the subject of the present complaint, in this District.

<u>**GENERAL FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**</u>

**Clarins' Misleading Efficacy Claims**

25.     A central theme of Clarins' deceptive marketing campaign, which permeates throughout its print, television, in-store and web-based advertisements and product displays and sales brochures, is that its products, and the results promised by Clarins, are supported by scientific research and resulting innovations.  As described in more detail below, Clarins' marketing campaign highlights the purported years of scientific research and study, patents, clinical and consumer tests and other repeated references to scientific sounding terms that, according to Clarins, "prove" the promised results.

26.     In fact, while such science-based and clinical claims provide Clarins with an increased level of credibility among unsuspecting consumers, and therefore increased sales, the purported scientific research and clinical "proof" is simply part and parcel of Clarins' deceptive and misleading advertising campaign.

27.     One of the reasons Clarins saturates its marketing campaigns with misleading scientific references is that it knows that such repeated and pervasive references to scientific terms and data makes it more likely that consumers will believe that its products are approved by the FDA, when in fact they are not.  Clarins knows that consumers who believe that the Beauty-

Enhancing Creams have received FDA approval are more likely to believe Clarins' false efficacy promises and therefore more likely to purchase the high-priced Beauty-Enhancing Creams.

28.    Indeed, upon information and belief, Clarins even goes so far as to train its in-store sales people to tout that its products are "FDA approved" when in fact they are not.  Clarins does so to further convince consumers that the Beauty-Enhancing Creams merit the high prices Clarins charges in order to further increase sales.

29.    Clarins' specific claims of efficacy cannot be defended as mere puffery.  Clarins' claims of scientifically backed research and unique ingredient discoveries go beyond any mere sales puffery by claiming first that certain specific ingredients enable the Beauty-Enhancing Creams to provide the unique benefits and then by providing specific "proven results" affirmations and promises of those benefits.  Indeed, such specific scientific references are an integral part of its marketing campaign, as evidenced by Clarins' reliance on such false and misleading efficacy promises.

30.    Clarins relies on such promises of scientific reliability and "proven effectiveness" because it knows that consumers are more likely to believe its empty promises, and therefore more likely to purchase its products, when the indicia of scientific reliability and study are present.

31.    Even if one or more of Defendants' claims is literally true, when viewed in their totality, the promises made by Defendants regarding the efficacy of the Beauty-Enhancing Creams are nevertheless misleading to the average consumer and are therefore actionable regardless of their literal truthfulness.

**Clarins' Misleading and Deceptive References to Scientifically Sounding Data**

32.     Clarins' product marketing strategy also includes references to nonsensical "clinical" studies or trials and "consumer tests" that purport to "prove" that the promised results are real.  However, Clarins knows, or should know, that the purported "proof" is not reliable and does not translate to actual results for consumers.  Despite this, Clarins continues to convey its message of "proof" because it knows that average consumers are swayed by such indicia of credibility and Clarins takes full advantage of this to profit on consumers' gullibility.

33.     By way of example, Clarins misleads consumers by claiming that many of its promised results are supported by "clinical tests" or "consumer tests" which Clarins knows sounds scientifically reliable to the average consumer.  Indeed, for each of the Beauty-Enhancing Creams, Clarins claims that the promised results are "proven."  Such references to scientific-sounding studies or "tests" which "prove" that the results are real are therefore themselves deceptive and misleading (regardless whether the studies or tests exist).

34.     In fact, Clarins designs such "tests" to support the promised results knowing that the results are not reliable and will not translate to consumers.

35.     Upon information and belief, flaws in Clarins' studies and tests include, but are not limited to (1) studies with too few participants to yield results that are scientifically or statistically significant such that Clarins could reasonably believe that the results would translate to consumers, (2) studies or consumer tests that are specifically designed to yield the desired results, or (3) tests where participants are cherry picked and/or where results are selectively determined such that Clarins is able to manipulate the results to support the purported benefits of the Beauty-Enhancing Creams for use in its advertising materials.

**Clarins' Misleading Use of Footnotes and Asterisks**

36.     Another way that Clarins misleads consumers is by its pervasive use of footnotes or asterisks throughout its marketing materials to deceptively hide the basis for its "results proven" claims.

37.     For example, Clarins claims that the results of its products are "tested and proven effective" based on a different "clinical" or "consumer" test for each product, the factual basis for which are often buried in illegible footnotes.

38.     An illustration of this practice can be seen by looking at the "tested and proven effective" tab on the Clarins website for its Body Lift Cellulite Control.   While Clarins claims that the results (such as 78% reduced cellulite) are "proven effective" the purported basis for this proof are based on consumer tests, the parameters of which are not disclosed and which also purportedly include the "Clarins Self-Massage Body Contouring Method."

**Clarins' Pervasive and Misleading National Marketing Campaign**

39.     Clarins' pervasive false and misleading national marketing campaign includes the dissemination of deceptive advertising through a variety of media including, but not limited to, internet, television and print, as well as in-person product presentations and demonstrations by Clarins-trained beauty consultants and sales people.  Many of the same deceptive and misleading statements are also printed on the product boxes.

**<u>Internet Marketing</u>**

40.     Clarins' internet marketing includes, among other things, video presentations, statistical data, ingredient benefits, how-to videos and question and answer information on its own website, Clarinsusa.com.   In addition, Clarins' products and advertisements appear on numerous third-party websites including, but not limited to, Sephora.com, Macys.com,

Amazon.com, Neimanmarcus.com, Nordstrom.com, and facebook.com.   Many of its commercials and promotional videos are also readily accessible on youtube.com.  Each of these sources provides consumers access 24 hours a day, 7 days a week, to Clarins' deceptive advertising.

### Print Media

41.     Clarins also heavily markets its Beauty-Enhancing Creams in print media, including the placing of advertisements in such widely circulated magazines as Glamour, Elle, Marie Claire, Vogue and Allure, among others.  Clarins specifically targets print advertising of the Beauty-Enhancing Creams in magazines with readership in the 25-to-60 age bracket.

42.     The specific dates and places of each of Clarins' advertisements are in the possession of Defendants.

### In-Store Sales People

43.     Upon information and belief, Clarins also provides training and disseminates uniform information to sales persons regarding the Beauty-Enhancing Creams.  These sales persons are trained by Clarins to parrot and reinforce the same purported benefits of using the Beauty-Enhancing Creams as well as the pseudo-scientific data supporting such promised results as contained in Clarins' other forms of advertising.

**Other Challenges to Clarins Misleading Advertising**

44.      This is not the first time Clarins has been challenged for its deceptive or false advertising.

45.     In 1988 the FDA seized certain Clarins products and ordered them to be exported back to France because they contained false claims.

46.     Clarins was again targeted by the FDA in 1998 when the Newark, NJ district office of the FDA ordered that Clarins' Double-Serum Multi-Regenerant Anti-Aging be returned to France based on similar false product claims.

**Short Product Cycles Illustrate Clarins' Efficacy Claims are Baseless**

47.     To perpetuate its deceptive and misleading scheme, and as evidence thereof, Clarins has a short product cycle, releasing new products at least every few years based upon some new "research" or purported new discovery or ingredient.  Clarins does so in order to falsely tout its new products via a re-imagined marketing campaign in order to keep driving sales and profits that would otherwise stagnate once consumers used the products and realized that they do not perform as promised.  This scheme is evidenced by the fact that Clarins discontinues sales and production of its older products once new products are introduced to the market, despite the fact that the claims made on the discontinued products are seemingly amazing scientific breakthroughs.

48.     For example, Clarins discontinued its Younger Longer Collection despite its purported ability to "repair and protect capillaries and nerve endings damaged by the aging process" and to "boost microcirculation."

49.     Clarins also discontinued its Renew Plus product, despite its promises that it "helps eliminate dead skin cells and encourages skin renewal."

50.     Another example of a purportedly effective product that was nevertheless discontinued is the Clarins Body Shaping Supplement.  According to Clarins, the Body Shaping Supplement is/was "The only body treatment of its kind, this extraordinary product is formulated with seven key botanicals with proven refining and streamlining properties. Formulated with

baccharis, hortonia and agrimony to help smooth away sponginess, inhibit the development of fat tissue and smooth and tone skin."

51.     Clarins' removal of purportedly effective products, like the Younger Longer Collection, Renew Plus, and the Body Shaping Supplement from the market is further evidence that Clarins' promised benefits are illusory and nothing more than clever marketing.

52.     Clarins also continues to tout new versions of its long standing collections, promising ever greater results based upon purported new ingredients or formulation.   For example, Clarins makes the following claim about its new formula for its Multi Active Collection:

> Clarins Multi Active Day cream has been a skincare staple for almost two decades, keeping skin protected for up 14 hours. Now, as it turns 21, it emerges in a new, improved format, a promise to correct early wrinkles, and a great new serum.

**Clarins' Specific Beauty-Enhancing Product Claims**

53.     Clarins makes specific promises regarding the efficacy of the Beauty-Enhancing Creams as further detailed below.

### **Vital Light Collection**

54.     The cost of Vital Light Night Revitalizing Anti-Ageing Cream is $90 for 1.7 oz. The cost of Vital Light Day Illuminating Anti-Ageing Cream is $85 for 1.7 oz. The cost of Vital Light Day Illuminating Anti-Ageing Cream SPF is $85 for 1.7 oz. The cost of Vital Light Day Illuminating Anti-Ageing Comfort Cream is $85 for 1.7 oz. The cost of Vital Light Night Revitalizing Anti-Ageing Comfort Cream is $90 for 1.7 oz. The cost of Vital Light Serum is $85 for 1 oz.

55.     Plaintiff Garcia purchased Vital Light Night Revitalizing Anti-Ageing Cream for $90.00 at the Macy's department store at the Dadeland Mall in Miami, Florida in or about

January 2013.  As stated herein, Plaintiff Garcia purchased Vital Light Night Revitalizing Anti-Ageing Cream based upon Clarins' false and misleading product efficacy statements, including that use of the "internationally patent pending" product would firm and tone skin, restore deep luminosity, and help boost microcirculation to ensure waking to a healthy-looking and revitalized complexion. The statements received by Plaintiff Garcia were material and influenced her purchase decision.

56.     Clarins makes the following efficacy promises for its Vital Light Collection:

- Defies dark spots, dullness and wrinkles in just 2 weeks!

- Clarins pioneers a new frontier of anti-aging skin care with a supercharged serum that defies the signs of aging in just two weeks.  This triple action complex of Hexylresorcinol a tripeptide and pioneer plant extracts helps corrects the appearance of dark spots while visibly lifting, firming, and restoring the deep luminosity of young-looking skin.  Hexylresorcinol has the same effectiveness as hydroquinone, an anti-dark-spot ingredient used in the pharmaceutical industry

- Only Clarins science harnesses the power of three rare pioneer plants that firm, unify and restore deep luminosity with spectacular age-defying results.

- Cochlearia Officinalis and Waltheria extracts* help strengthen the collagen network, reduce wrinkles, firm and promote a youthful-looking glow.  Spergularia extract helps lighten age spots and hyperpigmentation for a smooth, unified skin tone.
  * International patents pending.[3]

- It also visibly lifts and firms skin while restoring the deep luminosity of a young-looking complexion. Vital Light Serum features the unprecedented ingredient Hexylresorcinol. The latest scientifically proven dark spot reducer, this active ingredient addresses dark spots at the source: the pigmentation process. It is four times more effective than a two percent concentration of hydroquinone, an anti-dark spot ingredient used in the pharmaceutical industry. This serum also includes a tripeptide and exclusive plant extracts. (Sephora.com)

- A vital breakthrough—the first anti-wrinkle skincare range that restores deep luminosity, so skin seems to light up from within. Revive skin luminosity and diminish visible signs of time. The essential partner to Vital Light Day, the anti-aging night cream helps boost microcirculation to ensure that you wake to a healthy-looking

---

[3]     As alleged in the High Definition Body Lift section, Clarins' references to patents in its advertising and marketing for Vital Light are themselves deceptive.  *See infra* ¶¶ 77-79.

and revitalized complexion. Palmitoyl glycine encourages optimal skin nutrition to restore and ensure a fresher-looking complexion in the morning. Cochlearia officinalis and waltheria work together to help strengthen the collagen network to reduce wrinkles, firm skin and restore luminosity. (Nordstrom.com)

- What it is: A powerful age-repairing concentrate that corrects dark spots and wrinkles while restoring luminosity.

- What it is formulated to do:  Clarins pioneers a new frontier of skin science with a supercharged serum that defies the signs of aging in just two weeks. This triple-action complex of Hexylresorcinol, a tripeptide, and pioneer plant extracts helps correct the appearance of dark spots while visibly lifting, firming, and restoring the deep luminosity of young-looking skin. This serum works best with Vital Light Day or Vital Light Night. (http://www.sephora.com/vital-light-serum-P296438).

57.    Thus, Clarins' marketing theme for the Vital Light Collection focuses on science and comparisons to pharmaceutical products.   Indeed, Clarins claims that ingredients Hexylresorcinol and Palmitoyl glycine and "pioneering" plant extracts will strengthen the collagen network, reduce wrinkles, lift, firm, correct dark spots, and restore vitality and luminosity.

58.    These efficacy claims are misleading and deceptive because no ingredient or combination of ingredients in the Vital Light products (or the Body Lift products) can provide these promised benefits, otherwise the products should be regulated as drugs, because the efficacy claims Clarins makes imply that the products are intended to affect the structure or function of the human body, rendering them drugs under the Federal Food, Drug, and Cosmetic Act, which Clarins has failed to do.  Moreover, as described herein, Clarins' use of scientific jargon and references to patents furthers the marketing message that these products are worth their high price tag because they will reduce or eliminate signs of aging.

59.    Clarins repeats these efficacy claims in a video viewable on YouTube at http://www.youtube.com/watch?v=sIkIkuef19A.

15

60.     According to the Mayo Clinic, "while many over-the-counter wrinkle creams and lotions promise to reduce wrinkles and prevent or reverse damage caused by the sun . . . these products are not likely to make a noticeable difference in your skin."

**Body Lift Collection**

61.     Clarins also sells a line of products which it claims help to slim and firm the body and reduce cellulite.   The "concerns" Clarins claims that these products purport to address include cellulite control, firming, slimming and stubborn fat. Clarins' "Body Lift" Collection includes Body Lift Cellulite Control and High Definition Body Lift.

62.     Clarins makes the following efficacy claims about its Body Lift Cellulite Control cream:

- Prevents and corrects cellulite;

- The *first* slimming treatment that *breaks* the vicious cellulite cycle;

- A Clarins research innovation, targets early and stubborn cellulite.

- What it is: A body cream for the hips, thighs, and buttocks that visibly corrects stubborn cellulite while smoothing, firming, and redefining.

- What it is formulated to do: Clarins breaks the vicious cellulite cycle with the first slimming treatment that visibly corrects the appearance of cellulite. It targets cellulite before it starts—visibly smoothing hips, buttocks, and thighs for a slimmer silhouette. It hydrates and softens skin, reshapes, lifts, tones, and visibly improves skin firmness. Combine with a healthy lifestyle, and Clarins' proven Self-Massage Body Contouring Method, for results so scientifically-advanced, there are four patents pending. *

    *Patents filed (FR,WO).

63.     Under the "Tested and Proven Effective" section of its website, Clarins further promises the following:

16





64.     The Mayo Clinic provides the following information on cellulite:

- Cellulite refers to the appearance of dimpled skin on the thighs, hips, buttocks and abdomen of most women and some men, too. Cellulite is most common in areas of fat deposits and is the result of the unevenness of this fatty tissue beneath the skin surface.

- Cellulite is caused by fibrous connective cords that tether the skin to the underlying muscle, with the fat lying between. As the fat cells accumulate, they push up against the skin, while the long, tough cords are pulling down. This creates an uneven surface or dimpling.

- Cellulite is much more common in women than in men. In fact, the majority of women — at least 8 out of 10 — have some degree of cellulite. This is because fat is typically distributed in women in the thighs, hips and buttocks — common areas for cellulite. In addition, cellulite is more common with aging, when the skin loses some of its elasticity.

- Weight gain can make cellulite more noticeable, but cellulite may still be present in lean individuals. It tends to run in families, so genetics may play the biggest role in whether you develop cellulite.

65.    With respect to possible treatments to correct, remove or reduce cellulite, the

Mayo Clinic provides that:

- Treatments and drugs:

  o    Weight loss — through healthy diet and regular exercise — is probably the most beneficial cellulite treatment. Losing pounds and strengthening muscles in your legs, thighs, buttocks and abdomen can improve the appearance of the dimpled skin. The benefits of weight loss alone are limited, however. Though the cellulite may be less noticeable after weight loss, it won't go away completely.

  o    Lasers and radiofrequency systems.  Perhaps the most promising medical therapy is lasers and radiofrequency systems. One system uses combined negative tissue massage, radiofrequency and infrared light to treat cellulite. Another system delivers combined tissue massage with diode laser energy. A third system uses radiofrequency at deep and superficial levels simultaneously to treat cellulite. All three systems offer improvements to cellulite after a series of treatments. Results may last up to six months.

  o    Liposuction.  Some people may turn to liposuction as a treatment for cellulite. During liposuction, a surgeon inserts a narrow tube under your skin through tiny incisions and then suctions out fat cells. Though liposuction can shape the body, it won't remove cellulite, and it may make the cellulite appear worse. Laser-assisted liposuction is a newer, less invasive form of this treatment that destroys fat cells while tightening the skin, and may be a more effective treatment for cellulite.

  o    Topical treatment.  A twice daily application of 0.3 percent retinol cream has been shown to improve the appearance of cellulite after six months.

66.     The Mayo Clinic further provides that "Many devices, products and creams claim to treat cellulite.  But there is little or no scientific evidence to support these claims.  If you do find a cellulite treatment that improves your skin, the results aren't likely to last long term."

67.     In addition, the Mayo Clinic further discusses some of the more popular advertised "treatments" for cellulite:

- The following are a few of the many advertised cellulite treatments. Keep in mind that these treatments haven't been proved effective in removing cellulite.

   o     Vigorous massage. Some cellulite treatments are based on the concept that vigorous massage will increase blood flow, remove toxins and reduce excess fluid in cellulite-prone areas. One method in particular, Endermologie (also referred to as Lipomassage), uses a hand-held machine to knead the skin between rollers. You may notice a slight improvement to your skin after this treatment, but the results are typically short-lived.

   o     Mesotherapy. This procedure involves injecting a solution — which may contain a combination of aminophylline, hormones, enzymes, herbal extracts, vitamins and minerals — under the skin. This treatment can cause several unwanted effects, including infection, rashes, and bumpy or uneven skin contours.

   o     *Cellulite creams*. Creams that contain a variety of ingredients, such as vitamins, minerals, herbal extracts and antioxidants, are often marketed as the cure for cellulite. ***But no studies show that these creams offer any improvement. And in some cases, the ingredients in these products cause skin reactions or rashes.*** (Emphasis added.)

68.     The National Institute of Health confirms that no existing treatment has been shown to get rid of cellulite:

   No existing treatments including weight loss, exercise, massages, wraps, *creams*, supplements, or surgery has yet been shown to get rid of cellulite once you have it.  Liposuction is not recommended for cellulite, and may even make it look worse. New treatments such as laser are being developed for cellulite.

69.     Plaintiff Garcia purchased Body Lift Cellulite Control for $90.00 at the Macy's department store at the Dadeland Mall in Miami, Florida in or about January 2013.  As stated herein, Plaintiff Garcia purchased Body Lift Cellulite Control based upon Clarins' false and

misleading product efficacy statements, including, among other things, that use of Body Lift Cellulite Control would prevent and correct cellulite, smooth, firm and redefine skin, and reshape, lift and tone.  The statements received by Plaintiff Garcia were material and influenced her decision to purchase.

70.     Body Lift Cellulite Control is sometimes sold as part of Clarins "Cellulite Control Set":



71.     Clarins also advertises its Cellulite Control Products via television commercials and videos on its own website, including the following which makes the same efficacy claims regarding cellulite removal and reduction as those found in Clarins' other forms of advertising:

**A**



**B**



**C**



**D**



**E**



**F**



**G**



"With Body Lift Cellulite Control, for the first time, Clarins targets the vicious circle of cellulite."

**H**



"Excess fat from our diet is stored in fat cells, which increase in size until they become saturated."

**I**



"This process is called Hypertrophy."

**J**



"Body Lift's formula targets stubborn cellulite."

**K**



"Celosia plant extract limits the saturation of fat cells by slowing down fat storage."

**L**



**M**



"When fat cells become saturated they can cause other non-fat cells called 'Progenitor Cells' to become new fat cells."

**N**



**O**



"An increase in the number of fat cells leads to poor diffusion of oxygen called 'Hypoxia,' which is responsible for the multiplication of these Progenitor Cells."

**P**



"Body Lift Cellulite Control provides a double-action on early cellulite."

**Q**



"Water mint extract limits Hypoxia to slow down the multiplication of Progenitor Cells..."

**R**



"...while Celosia extract delays their transformation into fat cells."

**S**



"The vicious circle of cellulite is broken."

**T**



"Day after day, cellulite looks visibly reduced and the appearance of new cellulite is slowed down."

<u>U</u>



72.     In addition to repeating many of the same false and deceptive efficacy claims as its other forms of advertising, this video also illustrates (slides Q & R) how Clarins misleads consumers by claiming that many of its promised results are supported by "in-vitro testing," which Clarins knows sounds scientifically impressive to the average consumer.

73.     In fact, "in-vitro" is Latin for "in glass" and it means that the results are based on lab testing rather than "in vivo" testing on people. In other words, "in-vitro" results are based on ingredient testing on cells in a test tube or petri dish, which means that the ingredients' ability to penetrate actual human skin cannot be assessed. Clarins is well aware of this reality, yet continues to convey to consumers that "in-vitro" results support its efficacy claims.

74.     Further, as can be seen in slide K, Clarins appears to reference an "In Tubo" test, which is apparently different than "in-vitro" tests, yet Clarins fails to disclose what these tests are

or how they might support the message being conveyed regarding the products' ability to "slow down fat storage."

**High Definition Body Lift**

75.     Also targeting the "concern" of cellulite is High Definition Body Lift, for which Clarins makes the following efficacy promises in a variety of media to consumers:

- Fights Cellulite
- Get your body into sleek, show-off shape! Clarins patented cellulite-fighter — with Blue Button Flower, Geranium and Cangzhu root — helps release and flush-out trapped fatty deposits on hips and thighs.
- Defines, contours and refines for a visible lifting and smoothing effect.
- Blue Button Flower- optimizes the release of localized fatty deposits.
- Baccharis- helps inhibit development of fatty tissue and strenghtens (sic) collagen fibers.
- Extract of Maritime Pine- boosts skin's microcirculation.
- Sunflower extract and Horse Chestnut- increases penetration of caffeine, well known for its fluid-reducing action.
- Uncaria Tomentosa- inhibits fat storage in skin cells.
- Geranium and Cangzhu- helps activate fat release enzymes.
- An intensive cellulite control treatment that helps optimize the release of excess fat, even from the most stubborn places.

76.     Clarins goes on to claim that its patented cellulite-fighter--with Blue Button Flower, Geranium and Cangzhu root--helps flush out trapped fatty deposits on hips and thighs. Defines, contours and refines for a visible lifting and smoothing effect.

77.     In addition to the false, deceptive or misleading efficacy claims, Clarins misleads and deceives customers by its claim that High Definition Body Lift is a patented product.

32

78.     Despite Clarins' claim of patent protection in its advertising, the insert for the High Definition Body Lift, which consumers receive only after purchasing the product notes that the patent is "pending."

79.     Accordingly, in addition to being deceptive or misleading, the use of the word "patent" by Clarins in its advertising materials also constitutes false marketing under U.S. patent law.  According to 35 U.S.C. § 292(a):

> (a)     Whoever, without the consent of the patentee, marks upon, or affixes to, or uses in advertising in connection with anything made, used, offered for sale, or sold by such person within the United States, or imported by the person into the United States, the name or any imitation of the name of the patentee, the patent number, or the words "patent," "patentee," or the like, with the intent of counterfeiting or imitating the mark of the patentee, or of deceiving the public and inducing them to believe that the thing was made, offered for sale, sold, or imported into the United States by or with the consent of the patentee; or **Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article the word "patent" or any word or number importing the same is patented, for the purpose of deceiving the public**; or Whoever marks upon, or affixes to, or uses in advertising in connection with any article the words "patent applied for," "patent pending," or any word importing that an application for patent has been made, when no application for patent has been made, or if made, is not pending, for the purpose of deceiving the public - Shall be fined not more than $500 for every such offense. (Emphasis added)

**The Results of Clarins' Deceptive Conduct**

80.     Ignoring the inability of the Beauty-Enhancing Creams to provide the promised results, Clarins' pervasive false and misleading marketing campaign leaves consumers with the impression that its products are uniquely able to provide certain effects on human skin.

81.     Clarins compounds this deception by maintaining that the products and the promised results are based on years of research and scientific study and unique ingredients.

82.     Clarins reinforces this point with its repeated references to research, labs, proven results, and claims of scientific breakthroughs, among other things, as a way to bolster the credibility of the products in the eyes of the consumer.  In fact, these claims are merely part and

parcel of Defendants' false and misleading advertising program for its Beauty-Enhancing Creams.

83.     In addition to the material misrepresentations as described herein, Defendants' actions are likewise actionable based on their material omissions, which similarly induced Plaintiff and the other members of the Class and Subclass to purchase Beauty-Enhancing Creams.  For example, Defendants have failed to disclose the following:

- That the FDA considers the removal or reduction of cellulite as affecting the structure or function of the body and therefore would require such products to be registered as Drugs;

- That the referenced clinical or consumer tests were specifically designed to be used in Clarins' marketing efforts;

- That none of the Beauty-Enhancing Creams provide unique benefits that cannot be found in other, less expensive products; and

- That any benefits actually provided by the use of the Beauty-Enhancing Creams are only temporary.

84.     Clarins is in a position to actually know, or should know, that the promised results are not possible, *i.e.* its skin-care products cannot remove wrinkles, reduce or remove cellulite, or provide the other promised results.  Clarins fails to disclose that its products do not perform as promised.

85.     Until such time as Clarins ceases to engage in deceptive and misleading advertising of the Beauty-Enhancing Creams, Plaintiff and the other members of the Class and Subclass will continue to be harmed.

86.     Clarins' claims of efficacy based on scientific innovation are a material and important factor in its marketing campaign because Clarins knows that consumers pay special attention to product claims that are science-oriented.  Clarins further knows that consumers can

be duped into paying a higher price for products that purport to provide proven skin-correcting benefits.

87.     Clarins also is aware that, because of the aging population, consumers are increasingly susceptible to such deceptive marketing and advertising and that such marketing and advertising will continue to yield it ever-greater profits.

88.     Indeed, it is for these precise reasons – increase sales and profits – that Clarins intentionally engages in its deceptive marketing and advertising campaign.

89.     Clarins has succeeded in its deceit and has in fact enjoyed massive profits from its deceptive campaigns.  Such enormous profits would not have occurred but for Clarins' deceptive and misleading marketing and advertising campaign.

90.     Clarins charges a high price premium for its products.  Plaintiff and the other members of the Class and Subclass would not have paid premium Clarins prices for the Beauty-Enhancing Creams had they known the truth regarding the deceptive marketing promises.

91.     Moreover, Plaintiff and the other members of the Class and Subclass believed they were purchasing Clarins products that would provide the promised benefits as detailed herein.  In reality, although Plaintiff and the other members of the Class and Subclass paid for these purported benefits, they did not get what they paid for.   Instead, the products Plaintiff and the other members of the Class and Subclass purchased did not provide the promised results.

92.     As a result and because of Clarins' deceptive marketing, Plaintiff and the Class and Subclass members have been harmed in their purchases of the Beauty-Enhancing Creams.

93.     Without knowing the truth as to the efficacy of the Beauty-Enhancing Creams, Plaintiff and the other members of the Class and Subclass paid exorbitant premiums for Clarins' skin-care products and/or received totally worthless products.

## CLASS ACTION ALLEGATIONS

94.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 (a), (b)(1), (b)(2),

and (b)(3) on behalf of the following nationwide consumer class (the "Class"):

> All purchasers of at least one of the Beauty-Enhancing Creams in the
> United States from date of product launch to the present (the "Class
> Period"). Excluded from the Class are Defendant, its parent, subsidiaries
> and affiliates, their directors and officers and members of their immediate
> families; also excluded are any federal, state or local governmental
> entities, any judicial officers presiding over this action and the members of
> their immediate family and judicial staff, and any juror assigned to this
> action.

95.     Plaintiff also seeks to represent a subclass defined as all members of the Class

who purchased Beauty-Enhancing Creams in Florida ("the Florida Subclass").

96.     Members of the Class and the Florida Subclass are so numerous that their

individual joinder herein is impracticable. Members of each of these classes number in the tens

of thousands. The precise number of Class members and their identities are unknown to Plaintiff

at this time but will be determined through discovery. Class members may be notified of the

pendency of this action by mail and/or publication through the distribution records of Defendants

and third party retailers and vendors.

97.     Common questions of law and fact exist as to all Class and Subclass members and

predominate over questions affecting only individual Class and Subclass members. Common

legal and factual questions include, but are not limited to:

> (a)     whether Defendants were unjustly enriched by their conduct;
>
> (b)     whether Defendants breached an express warranty made to Plaintiff and
>         the other members of the Class and Subclass;
>
> (c)     whether Defendants advertise or market the Beauty-Enhancing Creams  in
>         a way that is false or misleading;

    (d)    whether Defendants concealed from Plaintiff and the other members of the Class and Subclass that its Beauty-Enhancing Creams do not provide the promised results;

    (e)    whether, by the misconduct set forth in this Complaint, Defendants have engaged in unfair, fraudulent or unlawful business practices with respect to the advertising, marketing and sales of its Beauty-Enhancing Creams;

    (f)    whether Defendants violated the Florida Deceptive and Unfair Trade Practices Act

98.    Plaintiff's claims are typical of the claims of the members of the Class and Subclass as all members of the Class and Subclass are similarly affected by Defendants' wrongful conduct.  Plaintiff has no interests antagonistic to the interests of the other members of the Class and Subclass.  Plaintiff and all members of the Class and Subclass have sustained economic injury arising out of Defendants' violations of common and statutory law as alleged herein.

99.    Plaintiff is an adequate representative of the Class and Subclass because her interest does not conflict with the interests of the other members of the Class and Subclass she seeks to represent, she has retained counsel competent and experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of Class and Subclass members will be fairly and adequately protected by Plaintiff and her counsel.

100.    The common issues herein predominate over any individual issues.

101.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and Class and Subclass members. Each individual Class and Subclass member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden

on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**COUNT I**
**(Unjust Enrichment)**

102.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

103.    Plaintiff brings this claim individually and on behalf of the members of the nationwide Class and the Florida Subclass against Defendants.

104.    Although there are numerous permutations of the elements of the unjust enrichment cause of action in the various states, there are few real differences.  In all states, the focus of an unjust enrichment claim is whether the defendant was *unjustly* enriched.  At the core of each state's law are two fundamental elements – the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating the plaintiff.  The focus of the inquiry is the same in each state.  Since there is no material conflict relating to the elements of unjust enrichment between the different jurisdictions from which class members will be drawn, Florida law applies to those claims.

105.    Plaintiff and other members of the Class and Florida Subclass conferred a benefit on Defendants by purchasing one or more of the Beauty-Enhancing Creams.

106.    Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff's and Class and Subclass members' purchases of the Beauty-Enhancing Creams, which

38

retention under these circumstances is unjust and inequitable because Defendants misrepresented the efficacy of the Beauty-Enhancing Creams, which caused injuries to Plaintiff and the other members of the Class and Subclass because either they paid a price premium due to the deceptive advertising and false promises of efficacy or they purchased products that did not perform as promised and were therefore of no value to Plaintiff and the other members of the Class and Subclass.

107. Because Defendants' retention of the non-gratuitous benefit conferred on it by Plaintiff and the other members of the Class and Subclass is unjust and inequitable, Defendants must pay restitution to Plaintiff and the Class and Subclass members for its unjust enrichment, as ordered by the Court.

**COUNT II**
**(For Breach of Express Warranty)**

108. Plaintiff repeats the allegations contained in paragraphs 1-101 above, as if fully set forth herein.

109. Plaintiff brings this claim individually and on behalf of the Florida Subclass.

110. Defendants, as the designers, manufacturers, marketers, distributors, or sellers expressly warranted that the Beauty-Enhancing Creams would provide certain actual skin enhancing effects, when in fact they do not.

111. The effects as described in detail above were affirmations of fact and promises relating to the Beauty-Enhancing Creams which became part of the basis for the bargain that the Beauty-Enhancing Creams would conform to the affirmations of fact and promises.

112. Likewise, the effects as described in detail above were descriptions of the Beauty-Enhancing Creams which became part of the basis of the bargain that the Beauty-Enhancing Creams would conform to the description.

113.   Defendants knew or should have known that the Beauty-Enhancing Creams could never provide the results promised.

114.   Plaintiff and the other members of the Florida Subclass were injured as a direct and proximate result of Defendants' breach because they paid a price premium due to the deceptive advertising and false promises of Defendants.   Alternatively, Plaintiff and Florida Subclass members were injured as a direct and proximate result of Defendants' breach because they paid for products that could never provide the promised results, rendering the products valueless to Plaintiffs and Class members.

**COUNT III**
**(Violation of the Florida Deceptive and Unfair Trade Practices Act)**

115.   Plaintiff repeats the allegations contained in paragraphs 1-101 above, as if fully set forth herein.

116.   Plaintiff asserts this claim individually and on behalf of the other members of the Florida Subclass.

117.   This is a claim for relief under Florida Statutes § 501.201, *et seq.*, the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

118.   The purpose of FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

119.   Florida Statutes § 501.204(1) prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

120.   Florida Statutes § 501.203(8) states that "trade or commerce means the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise,

of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated."

121.    Throughout the Class Period, Defendants conducted trade or commerce within the meaning of § 501.203(8) and FDUTPA by its advertising, offering for sale, and sale of their Beauty-Enhancing Creams.

122.    The Beauty-Enhancing Creams are "goods" within the meaning of FDUTPA.

123.    Plaintiff and the other Florida Subclass members are "consumers" as defined by Florida Statutes § 501.203(7).

124.    Defendants' acts and practices, as alleged herein, constitute unfair, deceptive, and/or unconscionable acts and practices in violation of FDUTPA, including but not limited to, Defendants' sale of Beauty-Enhancing Creams labeled, packaged, advertised, marketed, and sold as having certain skin enhancing benefits and Defendants' failure to disclose the true nature of said products.

125.    Defendants' business practices and conduct, as described herein further violate Florida Statutes § 501.204(1) in that the practices offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers, causing actual damages to consumers, including Plaintiff and the other Florida Subclass members who purchased Beauty-Enhancing Creams because of Defendants' representations and conduct.

126.    Defendants' unconscionable, unfair, and deceptive acts and practices set forth herein were likely and reasonably foreseeable to mislead — and did mislead — Plaintiff and the other members of the Florida Subclass, who acted reasonably in the circumstances in their reliance on Defendants' acts and practices, and to their detriment and were deceived.

127.   Defendants' misrepresentations or omissions as set forth in this Complaint are material in that they relate to matters which are important to consumers or are likely to affect the purchasing decisions or conduct of consumers, including Plaintiff and the other Florida Subclass members regarding Beauty-Enhancing Creams.

128.   Defendants' violations of FDUTPA directly and proximately caused Plaintiff and the other Florida Subclass members to sustain substantial and ascertainable losses of money and/or property and other damages because they were induced to purchase or paid a price premium due to the false, misleading, and/or deceptive advertising and marketing of the Beauty-Enhancing Creams and Defendants' failure to disclose the true nature of said products.

129.   Plaintiff and Florida Subclass members are entitled to relief for their damages because of Defendants' practices, including but not limited to, actual damages, costs, attorneys' fees, and injunctive relief, pursuant to Florida law, including Fla. Stat. § 501.2105 and § 501.211.

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

A.   For an order certifying the nationwide Class and the Florida Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as Class Representatives and her attorneys as Class Counsel to represent the Class members;

B.   For an order declaring that Defendants' conduct violates the statutes referenced herein;

C.   For an order finding in favor of the Plaintiff, the nationwide Class, and the Florida Subclass on all counts asserted herein;

D.      For an order awarding compensatory, treble, and punitive damages in amounts to be determined by the Court and/or jury;

E.      For prejudgment interest on all amounts awarded;

F.      For an order of restitution and all other forms of equitable monetary relief;

G.      For injunctive relief as pleaded or as the Court may deem proper; and

H.      For an order awarding Plaintiff, the nationwide Class and the Florida Subclass.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial on any and all counts for which trial by jury is permitted by law.

Dated this 8th day of April, 2014.

Respectfully submitted,

**GELBER SCHACHTER & GREENBERG, P.A.**
1441 Brickell Avenue
Suite 1420
Miami, Florida 33131
Telephone: (305) 728-0950
Facsimile: (305) 728-0951

/s/ Adam M. Schachter
ADAM M. SCHACHTER
Florida Bar No. 647101
aschachter@gsgpa.com
FREDDY FUNES
Florida Bar No. 87932
ffunes@gsgpa.com

**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.**
James E. Cecchi
Caroline F. Bartlett
Zachary S. Bower
5 Becker Farm Road
Roseland, New Jersey 07068-1739
Telephone: (973) 994-1700
Facsimile:  (973) 994-1744

**NAPOLI BERN RIPKA SHKOLNIK LLP**
Brian H. Brick
Empire State Building
350 5th Avenue #7413
New York, New York 10118
Telephone: (212) 267-3200
Facsimile:  (212)-587-0031

*Attorneys for Plaintiff*